STATE OF NEW JERSEY, DEFENDANT IN ERROR, v.
ROBERT COX, PLAINTIFF IN ERROR.

Argued October 21, 1941—Decided January 9, 1942.

For the plaintiff in error, *Rocco Palese* and *Carl Kisselman*.

For the State, *Samuel P. Orlando*.

The opinion of the court was delivered by

HEHER, J.   The plaintiff in error was convicted of murder in the first degree and sentenced to death for the killing of one Agnes McBurney on April 23d, 1941, at her farm premises on Buffalo Road, in the Township of Gloucester, in the County of Camden.   He sued out this writ of error, and caused the entire record of the proceedings had upon the trial to be returned with the bill of exceptions pursuant to *R. S.* 1937, 2:195-16.

The first insistence is that the verdict was against the weight of the evidence.

It is said that "the theory upon which the case was tried" was that plaintiff in error was guilty of murder in the perpetration or attempted perpetration of a robbery of the deceased, and that the evidence does not "reasonably give rise to the inference" that, "at the time of the killing," he "had

an intent to commit robbery" as defined by *R. S.* 1937, 2:166-1. But there was such evidence.

True it is that the accused disavowed such felonious intent. In a confession made a few hours after the homicide, he declared that, in the course of a journey along the roadside, he stopped at the home of the deceased (with whom he became acquainted some six years before while he and her husband were in the same employment), for the purpose merely of procuring "a drink of water;" that he was markedly under the influence of liquor, and that the fatal altercation occurred after the deceased had upbraided him for calling in that condition and had ordered him to leave the premises. She then "shoved" and "hit" him, so he said, and he "fell against the truck" at rest in the yard nearby, and thereupon he seized a baseball bat standing against the house and "struck her * * * in the head," whereupon "she fell to the ground," and "then" he "just lost" his "nerve and struck her again." After thus felling her, he delivered "several more" blows to the head with the weapon to "make sure that she was dead, so she would not tell on" him. On the witness stand he modified this somewhat: He maintained that when he sought to repel an attack by the deceased's dog, "she reached out and got a bat, and" he "grabbed the bat quick out of her hand and * * * struck her * * * about two or three times." Only then, he affirmed, did he determine to search the house for money. And the argument is made that, although the accused ransacked the house and carried away a radio, which he pawned in Philadelphia later in the day, there is in these circumstances no evidence of an "intent to commit robbery prior to the striking of the fatal blow or blows," since it is reasonably inferable that "the plan or design to take the radio was not conceived until after the striking" of the lethal blows, and therefore the finding of a homicide done in the perpetration of a robbery is purely speculative.

But the version thus given by the accused was plainly not conclusive. It was within the province of the jury to reject this avouchment if the circumstances demonstrated beyond a reasonable doubt that the killing was done in the perpetra-

tion or attempted perpetration of a robbery. There was evidence reasonably tending in that direction. Concededly, the accused made a thorough search of the house in a quest for money "to buy more liquor." Finding none, he took the radio and proceeded without delay to convert it into money. Although he testified that he "was crazy with liquor and didn't know what" he "had done," the means subsequently taken to conceal the radio, and his immediate trip to Philadelphia to pawn it, are significant to full awareness of his actions and a preconceived design to rob as well. He fled the deceased's premises along a little-used back road and through a wooded section, thus avoiding the abutting highway. He acknowledged that this was a measure taken to avoid discovery with the stolen chattel. At a point near his home, he removed and discarded rubbers he had worn, fearing that "somebody might track" him. He borrowed 25 cents from a neighbor for bus fare to Philadelphia and, concealing the radio in a basket, he proceeded to that city, where he pledged it for a loan of $3.50 under a fictitious name and place of residence. His circumstantial account of his movements before and after the homicide bespeaks full consciousness of his actions. His memory failed him only as to the number of blows inflicted with the death-dealing instrument. From the time of the murderous assault, he was dominated, he admitted, by the single purpose to "get some money and get some more whiskey;" and it was for the jury to determine whether in fact the killing was in furtherance of a predetermined plan to rob.

Under all the circumstances, we cannot say that the resolution of this inquiry in the affirmative is so lacking in rationality as to be attributable to mistake, passion, prejudice or partiality. A verdict is not to be set aside as against the weight of the evidence under *R. S.* 1937, 2 :195-19, unless this taint clearly appears. Under our system of jurisprudence, the faculty of determining whether the guilt of the accused has been established beyond a reasonable doubt rests with the jury; and the test is not whether the minds of the reviewing judges are also satisfied of guilt so measured. The statutory authority thus to review the evidence was designed to

correct injustice resulting from a plain and obvious failure of the jury to function within its allotted sphere. *State* v. *Hauptmann,* 115 *N. J. L.* 412; *State* v. *Woodward,* 121 *Id.* 78.

Moreover, this argument does not take into account the submission to the jury of the alternative theory of a willful, deliberate and premeditated killing. There is no contention that the evidence is insufficient to warrant a finding of the elements of murder of this particular category. Nor could it well be made. As stated, the accused confessed that, after felling the deceased with one blow of the bat on the head, he delivered three or four more, likewise to the head, while she was prostrate and bereft of consciousness, so as to ensure her death and thus avoid detection. When called as a witness he denied making this admission, maintaining that he was "excited" and "half crazy with liquor," and remembered only "swinging the club" while the deceased "was standing in front of" him. But the evaluation of these conflicting utterances was peculiarly the province of the triers of the facts; and the conclusion of a design to take the life of the deceased accompanied by deliberation and premeditation cannot reasonably in the circumstances be deemed at variance with the weight of the evidence.

A design to take life is derivable from a homicide committed with a deadly weapon. A deadly weapon is one liable to produce death or great bodily injury; and, in case of doubt, the manner in which it was used may be considered in determining whether it takes that classification. The weapon used, the time consumed, and the circumstances of the killing may sustain an inference of deliberation and premeditation, as also the nature, location and severity of the wounds. *State* v. *Jones,* 115 *N. J. L.* 257. As in that case, the weapon here was "potentially deadly at the least;" and there was great violence in its use. There were three fractures of the skull—of the occipital bone, to the right of center; of the frontal orbital zygomatic bone on the right side; and of the left frontal bone three inches long which "laid the brain open." The surgeon who performed the autopsy described the latter fracture as the result of a "severe blow"

which "could have caused death * * * within a few minutes," later qualified to "half a minute or a minute." It is pertinent to note here that the accused's testimony as to the precise time when he formed the intent to kill is, of course, not decisive. It is to be assayed in the light of all the circumstances.

The second point made is that the trial judge erred in admitting in evidence two photographs (S-5 and S-6), purporting to represent, respectively, the condition of the deceased's bedroom and the inside of the shed adjoining the house upon the discovery of the body a few hours after death had occurred.

The argument advanced is that these photographs were inadmissible without proof establishing that the accused "was in the shed attempting to rob" and "was there discovered by the decedent," or "had been in the house ransacking same" and "was observed by the decedent," since that was the theory upon which the case was tried. It is plainly untenable, proceeding as it does upon an erroneous hypothesis.

It is axiomatic that if the killing was done in the perpetration or attempted perpetration of a robbery, it is within the statutory category, even though the search of the dwelling was not had until after the felonious assault had taken place.

And there is no merit in the further contention that the evidence does not support the inference that the photographs "correctly exemplify the actual situation, circumstances and surroundings at the time" of the accused's departure from the premises.

All this is likewise true of the testimony adduced from witnesses as to the condition of the interior of the house when they inspected it shortly after the occurrence of the homicide.

The foregoing considerations are also dispositive of the final point—raised by a motion to direct a verdict of murder in the second degree and by a request to charge—that the state had failed to prove "that the homicide was caused in the attempt to commit or to perpetrate the crime of robbery," and therefore the jury could "only bring in a verdict of murder in the second degree."

The judgment is accordingly affirmed.

For affirmance—THE CHANCELLOR, CHIEF JUSTICE, PAR-KER, CASE, BODINE, DONGES, HEHER, PERSKIE, PORTER, COLIE, DEAR, WELLS, WOLFSKEIL, RAFFERTY, HAGUE, THOMPSON, JJ. 16.

For reversal—None.